# United States Court of Appeals
## For the First Circuit

No. 25-1149

REBECCA BLAKESLEY,

Plaintiff, Appellee,

v.

JENNIFER MARCUS; COLLEEN MARCUS,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Rikelman, Lynch, and Aframe,
Circuit Judges.

Michael G. McDonough, with whom Edward J. McDonough Jr., Paul M. Bromwich, and Egan, Flanagan & Cohen, P.C., were on brief, for appellants.

Shaun M. Khan, with whom Keith L. Sachs and DDSK Law LLC were on brief, for appellee.

October 31, 2025

RIKELMAN, **Circuit Judge**.  This case presents difficult questions about the application of the Massachusetts anti-SLAPP statute.[1]  In 2021, Colleen and Jennifer Marcus reported alleged misconduct by Rebecca Blakesley, a nurse, to a number of governmental and private organizations.  In response, Rebecca sued them for defamation and tortious interference with business relations.  She contended that they made false allegations against her in retaliation for her recent decision to dissolve her marriage with Colleen's son.

The Marcuses moved to dismiss Rebecca's case under the anti-SLAPP statute, Massachusetts General Law chapter 231, § 59H.  This statute allows defendants to obtain early dismissal of a lawsuit if they can demonstrate that the claims against them were brought to discourage them from exercising their right to petition the government.  The district court denied the special motion to dismiss.  It concluded that Rebecca's claims were not based solely on "petitioning activity" because the Marcuses' reports to the private organizations did not qualify as petitioning, and as a result, the anti-SLAPP statute did not apply.  The Marcuses then filed this interlocutory appeal.  We choose to bypass the thorny questions surrounding our appellate jurisdiction because we resolve the merits in favor of the party who opposes our

_____

[1] SLAPP stands for "strategic lawsuit against public participation."

jurisdiction, Rebecca.    Thus, we affirm the district court's ruling.

## I. BACKGROUND

### A. Relevant Facts

Rebecca Blakesley married Andrew Blakesley in 2019.[2] She alleges that Andrew often threatened or abused her throughout their tumultuous relationship, which ended in January 2021.    In one episode in April 2020, during the COVID pandemic, Andrew threw a punch that hit Rebecca's hand and broke her finger.    According to Rebecca, Andrew then pulled her out of her chair by her hair, threw her on the bed, and struck her in the head, abdomen, and thighs. The next day, Andrew offered to help Rebecca with data entry for her nursing job, given the injury to her finger.    She eventually accepted his help, fearful that he would retaliate if she declined. At the time, Rebecca was working under contract as a nurse evaluator with several private healthcare agencies.    In her role, she conducted virtual evaluations of patients with disabilities and drafted written reports that she entered into an online portal. Rebecca gave Andrew access to these online databases from April to December 2020 so that he could input patient information on her behalf.

---

[2] We refer to Rebecca, Andrew, Colleen, and Jennifer by their first names to avoid confusion.

- 3 -

In the second half of 2020, as the COVID pandemic continued, their relationship deteriorated. One night in early December, Rebecca sought police assistance when Andrew became violent, resulting in Andrew's arrest for domestic assault and battery. Rebecca ended their relationship after this incident. Less than a week later, on December 11, Rebecca received a text from Andrew that read, in part, "Get ready for the investigation . . . ive [sic] got friends and family who actually care about me who are actually interested in all this. The jig is up [] and I'm not playing your games." Rebecca ultimately obtained an abuse prevention order against Andrew on January 7, 2021. Later that month, she filed for divorce.

Just days after a state court granted Rebecca a protective order against Andrew, Colleen and Jennifer, Andrew's mother and sister-in-law respectively,[3] reported alleged misconduct by Rebecca to various public and private organizations. They claimed that Rebecca had shared confidential patient information in violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), § 101(a), 29 U.S.C. § 1181 et seq.; fraudulently billed her time as a nurse evaluator; cheated and committed plagiarism while at nursing school; and faked a COVID test so that she could undergo a medical procedure. Jennifer filed

---

[3] Colleen is "not Andrew's biological mother but she raised him since he was an infant and Andrew considers her his mother."

a report with the U.S. Department of Health and Human Services, Office of Civil Rights (OCR), on January 15, 2021, and with the State of Connecticut Department of Public Health several days later.  She also contacted Rebecca's nursing school and several of Rebecca's private healthcare employers via phone and email to report the same alleged instances of HIPAA violations, fraudulent billing practices, and cheating.  On January 25, 2021, Colleen filed a complaint with the Board of Registration in Nursing (BORN), which is part of the Massachusetts Department of Public Health. In her complaint, Colleen explicitly referenced Jennifer's reports to OCR and Rebecca's nursing school.

After receiving Colleen's complaint, BORN launched an investigation of the allegations against Rebecca that would last three years.  The private healthcare companies terminated Rebecca's employment, and the Commonwealth halted its review of her application to become a licensed psychiatric nurse practitioner.

## B. Procedural History

On January 24, 2024, Rebecca filed this lawsuit against Colleen and Jennifer in federal court, relying on diversity jurisdiction under 28 U.S.C. § 1332.  She alleged that the Marcuses maliciously published false statements to destroy her career in retaliation for her decision to divorce Andrew.  Count I alleged defamation for the publication of these false statements.  Count

II alleged intentional interference with business relations for depriving Rebecca of her relationships with her previous employers.

In response, the Marcuses brought a special motion to dismiss under the Massachusetts anti-SLAPP statute. This statute provides a procedural mechanism for the early dismissal of "meritless suits brought to discourage individuals from exercising their constitutional right of petition." Bristol Asphalt, Co. v. Rochester Bituminous Prods., Inc., 227 N.E.3d 1019, 1026 (Mass. 2024) ("Bristol").

The district court denied the Marcuses' anti-SLAPP motion to dismiss. It did so after closely examining Bristol, a recent decision by the Massachusetts Supreme Judicial Court (SJC), which explained that the anti-SLAPP statute is not "applicab[le] to claims with a substantial basis other than or in addition to an individual's exercise of the right of petition." Id. at 1026 (discussing Duracraft Corp. v. Holmes Prods. Corp., 691 N.E.2d 935 (Mass. 1998)). Citing Bristol and other authority, the district court determined that the Marcuses had failed to show that Rebecca's claims of defamation and tortious interference were based solely on their petitioning activity. As the court explained, because the Marcuses' complaints to Rebecca's employers and former school did not qualify as "petitioning activity,"

Rebecca's case against them concerned "mixed claims," and thus the anti-SLAPP statute did not apply.

Colleen and Jennifer timely appealed.

## II. STANDARD OF REVIEW

We consider both (1) whether we have interlocutory jurisdiction over this appeal and, if so, (2) the merits of the district court's ruling denying the anti-SLAPP motion to dismiss. Both of those issues present questions of law. See Lee-Barnes v. Puerto Ven Quarry Corp., 513 F.3d 20, 25-26 (1st Cir. 2008) (citing Will v. Hallock, 546 U.S. 345, 347 (2006)).  Thus, we review the district court's ruling de novo.  See Steinmetz v. Coyle & Caron, Inc., 862 F.3d 128, 136 (1st Cir. 2017) (citing Godin v. Schencks, 629 F.3d 79, 85 (1st Cir. 2010)).

As a federal court sitting in diversity jurisdiction, we "look to [Massachusetts] law for the substantive rules of decision governing [the] state law arguments" under the anti-SLAPP statute. Smith v. Prudential Ins. Co. of Am., 88 F.4th 40, 47 (1st Cir. 2023) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). So "we endeavor to predict how the Commonwealth's highest court would" rule on the special motion to dismiss.  Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 598 (1st Cir. 2024) (citing Aubee v. Selene Fin. LP, 56 F.4th 1, 4 (1st Cir. 2022)).

### III. DISCUSSION

As we explain, we bypass the complicated questions about our statutory appellate jurisdiction over this interlocutory appeal because we resolve the case in favor of Rebecca, the party opposing our jurisdiction.

### A. Jurisdiction

The Marcuses contend we have jurisdiction under the collateral order doctrine, an "exception to 28 U.S.C. § 1291's statutory grant of jurisdiction over final decisions" by the district courts. Doe v. Town of Lisbon, 78 F.4th 38, 44 n.2 (1st Cir. 2023). The collateral order doctrine allows review of a "narrow class of decisions that do not terminate the litigation, but must, in the interest of 'achieving a healthy legal system,' nonetheless be treated as 'final.'" Digit. Equip. Corp. v. Desktop Direct Inc., 511 U.S. 863, 867 (1994) (citation omitted) (quoting Cobbledick v. United States, 309 U.S. 323, 326 (1940)); see also Lee-Barnes, 513 F.3d at 25. To qualify for review under the collateral order doctrine, an "interlocutory order must present: (1) a conclusive decision, (2) distinct from the merits of the action, (3) on an important issue, (4) which would effectively be unreviewable on appeal from a final judgment." Godin, 629 F.3d at 84 (citing Awuah v. Coverall N. Am. Inc., 585 F.3d 479, 480 (1st Cir. 2009)).

The parties' jurisdictional dispute centers on the second prong of the collateral order test: whether the anti-SLAPP motion to dismiss raises legal issues that are separate and "distinct" from the merits of Rebecca's underlying defamation and tortious interference claims. Id. To answer this question, we must evaluate the interplay between Massachusetts law on anti-SLAPP motions and the federal collateral order doctrine.

The SJC recently clarified the correct legal analysis for special motions to dismiss under the Massachusetts anti-SLAPP statute. See generally Bristol, 227 N.E.3d 1019. As the SJC made plain in Bristol, its goal was to replace an existing analytical framework that "ha[d] not provided an efficient or practical solution to the problem it was designed to address" with a simplified two-stage framework that "hews to the statutory language." Id. at 1027 (the "Bristol framework").

Under stage one of the Bristol framework, it was the Marcuses' burden (as the proponents of the special motion to dismiss) to make a "threshold showing through the pleadings and affidavits" that their conduct, which Rebecca has challenged in this lawsuit, consists solely of their petitioning activity. Id. at 1037 (quoting Duracraft, 691 N.E.2d at 943). If the Marcuses failed to meet this initial burden, it was incumbent upon the district court to deny their special motion to dismiss under Bristol. See id. If they succeeded, then the burden would have

shifted to Rebecca (as the special motion opponent) to demonstrate, in stage two, that the Marcuses' petitioning activity was "devoid of any reasonable factual support or any arguable basis in law" and "caused [her] actual injury." Id. at 1038 (quoting Mass. Gen. Laws ch. 231, § 59H).

Here, the district court's analysis of the anti-SLAPP motion started and ended with stage one of the Bristol framework. The court decided that, "even assuming the [Marcuses'] decision to report [Rebecca] was petitioning activity, [Rebecca's] claims are not based solely on protected activity. Rather, [the Marcuses] proceeded to also contact [Rebecca's] employers (and potentially her former school) after they had already made the governmental reports." The court concluded these "later efforts," targeted at private entities, "are not petitioning activity" under Massachusetts law and thus denied the motion. The court closed the order with a reminder that the Marcuses retained the opportunity to assert defenses to Rebecca's claims and move for summary judgment after discovery.

With the district court's stage one analysis in mind, we turn back to the question of whether the district court's ruling resolves a "distinct" legal issue, separate and apart from the merits of the case, that we can review under the collateral order doctrine. Godin, 629 F.3d at 84. This is a complex question that has divided other federal circuit courts.

A number of federal courts of appeals have declined to exercise interlocutory jurisdiction over orders denying anti-SLAPP motions to dismiss.  See, e.g., Gopher Media LLC v. Melone, No. 24-2626, 2025 WL 2858761 (9th Cir. Oct. 9, 2025) (en banc) (overruling Batzel v. Smith, 333 F.3d 1018 (9th Cir. 2003)); Coomer v. Make Your Life Epic LLC, 98 F.4th 1320 (10th Cir. 2024); Ernst v. Carrigan, 814 F.3d 116 (2d Cir. 2016).  In some of these decisions, the courts focused on the equivalent of stage two of the Bristol framework, which requires examining whether the petitioning activity was devoid of any factual or legal support, an analysis that those courts concluded is inevitably intertwined with the merits of the underlying action.[4]  And even on this issue, the federal circuit courts are split.[5]

_____

[4] See Coomer, 98 F.4th at 1327 (rejecting interlocutory jurisdiction over the order denying the anti-SLAPP motion to dismiss because evaluating step two of Colorado's anti-SLAPP statute, whether the plaintiff has shown that he will prevail on his claim, "necessarily involve[s] fact weighing and thus cannot be completely separate from the merits" of the defamation claim); Ernst, 814 F.3d at 119-20 (holding that the denial of relief under Vermont's anti-SLAPP statute was not appealable because step two of the analysis is "entangled in the facts" and not completely separate from the merits of the underlying defamation claim).

[5] The U.S. Court of Appeals for the Fifth Circuit concluded that a ruling denying an anti-SLAPP motion to dismiss under a Louisiana statute did satisfy the second prong of the collateral order doctrine, even when considering the factual basis of the claims under stage two.  See Henry v. Lake Charles Am. Press, L.L.C., 566 F.3d 164, 175-177 (5th Cir. 2009) (holding that a decision on the Louisiana anti-SLAPP motion to dismiss "is not a ruling on the ultimate merits; it is merely tangential to the merits," and the "minor possibility of minimal entanglement [of

We do not wade into this debate today.  As our precedent makes clear, we may assume appellate jurisdiction when, as here, the case poses a difficult question of statutory jurisdiction and our decision on the merits will favor the party challenging our jurisdiction.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 91 F.4th 501, 508-09 (1st Cir. 2024); see also Nisselson v. Lernout, 469 F.3d 143, 151 (1st Cir. 2006) (assuming statutory jurisdiction to avoid "sort[ing] out [the] thorny jurisdictional tangles" that the collateral order doctrine presents).

### B. Merits

To recap, the district court held that the Marcuses could not survive stage one of the Bristol framework and denied their anti-SLAPP motion to dismiss.  Specifically, it concluded that Rebecca alleged "mixed claims" that were not based solely on their petitioning activity.  The Marcuses insist that the district court erred, arguing that their reports to government agencies plainly qualified as petitioning activity and their reports to Rebecca's private employers were "made in connection with" their valid petitioning activity and so are also protected under the anti-SLAPP statute.  (Quoting Mass. Gen. Laws ch. 231, § 59H.)

The Massachusetts anti-SLAPP statute provides, "[i]n any case . . . in which a party asserts that the [claims] against [it]

the issues] is insufficient to overcome the interests that favor a finding of immediate appealability").

are based on [its] exercise of its right of petition under the [C]onstitution of the United States or of the [C]ommonwealth, [that] party may bring a special motion to dismiss." Mass. Gen. Laws ch. 231, § 59H. The anti-SLAPP statute defines a party's "exercise of its right of petition" as:

> [A]ny written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by [such body or proceeding]; any statement reasonably likely to encourage consideration or review of an issue by [such body or proceeding]; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

Id.

Under the statute, a court "shall grant" a special motion to dismiss "unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party." Id. Finally, the statute instructs a court to "consider the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based" when making its determination whether to grant the special motion. Id.

- 13 -

Recently, in Bristol, the SJC emphasized the "need to clarify and simplify" the analytical framework for evaluating anti-SLAPP special motions to dismiss. 227 N.E.3d at 1027. As it explained, over the years, parties had invoked the anti-SLAPP statute in an effort "to dismiss a wide array of [] claims concerning conduct far afield of the petitioning activity that the [Massachusetts] [l]egislature originally sought to protect." Id. at 1026. The court recognized that the complexity of the then-existing framework for analyzing anti-SLAPP motions had detracted from one of the "principal purposes" of the statute: "to obtain the expeditious dismissal of meritless claims that are based on petitioning alone." Id. at 1027. Overall, the SJC instructed courts to "proceed cautiously" before administering the "strong medicine" of granting an anti-SLAPP motion to dismiss. Id. at 1036. This caution was necessary, the court explained, because "both proponents and opponents of special motions to dismiss are engaged in petitioning activity," given that a plaintiff who files a lawsuit is, of course, exercising their own right of petition. Id.

In setting out a new, simplified framework in Bristol, the SJC explicitly held that its goal was to return to the "narrow and strict construction of the [anti-SLAPP] statute" initially set out in Duracraft, 691 N.E.2d 935. Bristol, 227 N.E.3d at 1037. Under that approach, the SJC took a strict view "of § 59H's

reference to claims 'based on' a party's petitioning activity . . . to 'exclude motions brought against meritorious claims with a substantial basis other than or in addition to the petitioning activities implicated.'" Id. at 1033 (quoting Duracraft, 691 N.E.2d at 943). As the SJC explained, this focus on whether a case involves claims based on petitioning activity alone is a "necessary part of a simplified anti-SLAPP framework" that "ensures that [a plaintiff's] own petitioning activity is not infringed." Id. at 1037.

Under the streamlined Bristol framework, the district court was required to evaluate at stage one whether Rebecca's underlying claims were based solely on the Marcuses' petitioning activity. See id. at 1036-37. In performing this analysis, the court was permitted to consider only the Marcuses' alleged conduct, not their motivations for that conduct. See 477 Harrison Ave., LLC v. Jace Boston, LLC, 74 N.E.3d 1237, 1244-46 (Mass. 2017).

The Marcuses argue that all their alleged conduct constitutes petitioning activity, whereas Rebecca maintains that only their complaints to the governmental entities qualify as petitioning. Thus, the parties' disagreement focuses on the complaints to the private entities: Rebecca's employers and her nursing school.

According to the Marcuses, their complaints to Rebecca's private employers qualify as petitioning activity because they

were statements "made in connection with an issue under consideration" by the government. Mass. Gen. Laws ch. 231, § 59H. In particular, they claim the employers were potential "witnesses" in any BORN investigation of Rebecca. They offer no argument, however, that their complaints to the nursing school qualify under this provision of section 59H, even though both the district court and Rebecca have emphasized this conduct as one reason why her claims are "mixed."

We thus turn to the "in connection" requirement. The SJC has stated that for statements to qualify as being "in connection with an issue under consideration" by a governmental body, there must be "a plausible nexus between the statement and the governmental proceeding." Blanchard v. Steward Carney Hosp., Inc., 75 N.E.3d 21, 30 (Mass. 2017), overruled on other grounds by, Bristol, 227 N.E.3d at 1035-36.[6] To assess if this "plausible nexus" exists, the SJC analyzes "objective indicia of a party's intent to influence a governmental proceeding," such as the timing, audience, and content of the statement. Id. at 30-33. But paramount to the analysis is whether the "communication [was] 'made to influence, inform, or at the very least, reach governmental bodies -- either directly or indirectly.'" Id. at 30 (quoting

---

[6] The SJC clarified in Bristol that the precedent "prior to Blanchard[] concerning mixed claims remains sound" and that the court was "not upend[ing] [its] jurisprudence concerning other aspects of the threshold inquiry." 227 N.E.3d at 1038 n.17.

Global NAPs, Inc. v. Verizon New England, Inc., 828 N.E.2d 529, 532 (Mass. App. Ct. 2005)).

The Marcuses claim that their statements to Rebecca's employers qualify under this standard because the employers were likely to be witnesses in any BORN investigation.  In support of this contention, they argue that statements they made to "third[ ]parties" that merely "reiterated" what they reported to the government qualify as part of their petitioning activity.  They point to three cases that they maintain stand for this proposition: Blanchard, 75 N.E.3d 21; Plante v. Wylie, 824 N.E.2d 461 (Mass. App. Ct. 2005); and Wynne v. Creigle, 825 N.E.2d 559 (Mass. App. Ct. 2005).

The difficulty for the Marcuses, however, is that none of these three cases support their argument.  First, none of these cases concern potential witnesses to a governmental proceeding, nor have we found any Massachusetts cases that address whether and when statements to a potential witness would qualify as petitioning activity under the anti-SLAPP statute.  Second, the cases do not come close to suggesting that any statements to third parties that merely reiterate a statement to a governmental body qualify as petitioning activity; instead, they stand for much narrower principles.  For example, Blanchard and Wynne concern statements to newspapers.  See Blanchard, 75 N.E.3d at 32; Wynne, 825 N.E.2d at 565-66.  In Blanchard, the statements were made by a hospital

- 17 -

president and communicated his views about an ongoing governmental investigation of the hospital. 75 N.E.3d at 31-32. In _Wynne_, Creigle (the defendant) made the statements to the newspaper in direct response to comments by the plaintiff, the opponent in the underlying governmental proceeding. 825 N.E.2d at 565. What is more, Creigle's statements were "mirror images" of what she had reported to the governmental body. _Id._ at 565-66 (describing Creigle's statements as "mere repetition[s]" of those she had already made during the underlying investigation of the plaintiff). On these facts, the courts in both _Wynne_ and _Blanchard_ concluded that the statements to the newspapers were "in connection" with the party's own attempts to influence the governmental body.[7] _Id._; _Blanchard_, 75 N.E.3d at 30-31. Moving on to _Plante_, the court in that case held that statements made in settlement negotiations between the two adversaries in a governmental proceeding were "in connection" with that proceeding. 824 N.E.2d at 463, 467-69. As it explained, statements designed

---

[7] To be clear, Massachusetts courts have ruled that statements to the media can qualify under the "in connection" provision of the anti-SLAPP statute in some circumstances but not others. For example, in _Global NAPS_, the court concluded that a statement to the press did not qualify as petitioning activity, even though it was about an ongoing governmental proceeding, because it was merely an "oblique reference" to that proceeding and not a "mirror image[]" of what was said in the governmental forum. 828 N.E.2d at 530, 534. As the court explained, not just "any statement about an issue under some form of government consideration . . . [is] protected by the statute." _Id._ at 532.

to resolve the governmental proceeding would, inevitably, influence the outcome of that proceeding. Id. at 468-69.

We see no basis under Massachusetts law for extending these cases to the facts here or for concluding that the Marcuses' statements to Rebecca's private employers would inevitably influence or reach BORN. Further, the Marcuses have failed to provide any argument at all about why the complaint to Rebecca's school should qualify as petitioning activity, thus waiving any basis for challenging the district court's ruling on that point. See United States v. Zannino, 895 F.2d 1, 16-17 (1st Cir. 1990); Sparkle Hill, Inc. v. Interstate Mat Corp., 788 F.3d 25, 29 (1st Cir. 2015) ("Our precedent is clear: we do not consider arguments for reversing a decision of a district court when the argument is not raised in a party's opening brief.").

As a federal court sitting in diversity, we "must exercise considerable caution when considering the adoption of a new application" of state law. Doyle v. Hasbro, Inc., 103 F.3d 186, 192 (1st Cir. 1996). And because it is "quintessentially the province of state courts" to "extend state law," Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir. 1996), we decline to do so here by concluding that statements to potential witnesses in governmental proceedings always satisfy the "in connection" requirement. Thus, based on the arguments presented, we see no basis for disturbing the district court's ruling that the Marcuses' reports to private

entities did not qualify as petitioning activity under current Massachusetts law and, as a result, the Marcuses failed to meet their burden at stage one of the <u>Bristol</u> framework.  For that reason, we affirm the district court's decision denying the anti-SLAPP motion to dismiss.

Finally, the Marcuses point out that Colleen did not personally contact any non-governmental entities, and thus she should prevail on her anti-SLAPP motion to dismiss, even if Jennifer cannot.  The district court found it plausible, however, that Colleen and Jennifer coordinated their actions, so it saw no reason to dismiss Colleen at that stage of the proceedings.  The Marcuses argue that the district court erred in this analysis. But the pleadings and affidavits support the district court's ruling about coordination between Colleen and Jennifer.  As we discussed above, Colleen's complaint to BORN references the complaints that Jennifer filed with OCR and Rebecca's nursing school.  The Marcuses provide no legal authority for their position that the district court erred in so concluding, based on its review of their own exhibits filed in support of their special motion to dismiss.  And because the SJC instructs "courts to proceed cautiously" before applying the "strong medicine" of granting an anti-SLAPP motion to dismiss, we determine that the Marcuses have failed to present any well-developed ground to overrule the

district court's decision on this point.  <u>Bristol</u>, 227 N.E.3d at 1036.

Our holding aligns with the SJC's instruction to take a narrow view of when claims are "based on" a party's exercise of its right to petition.  <u>Id.</u> at 1036-37.  As the SJC explained, the "powerful procedural protections" of the anti-SLAPP statute "were intended to be employed in a limited context: to ensure the expeditious elimination of meritless lawsuits based on petitioning activities alone."  <u>Id.</u> at 1037.  For that reason, "[m]ixed claims, that is, those based on a proponent's petitioning along with substantial conduct other than or in addition to the petitioning activities, . . . [are] best addressed in the course of ordinary litigation, where both sides' claims and defenses can be fully analyzed based on a more complete record, not special motions to dismiss."  <u>Id.</u> at 1036.  The district court held as much here.

### IV. CONCLUSION

For all these reasons, we **<u>affirm</u>** the district court's order denying the special motion to dismiss and **<u>remand</u>** for further proceedings.